IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| J.P. RAIL, INC., | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 05-2755 (JBS) |
| v. | |
| NEW JERSEY PINELANDS COMMISSION, | **OPINION** |
| Defendant. | |

| |
|---|
| NEW JERSEY PINELANDS COMMISSION, |
| Third-Party Plaintiff, |
| v. |
| MAGIC DISPOSAL, INC., ELWOOD BROKERAGE, INC., ELWOOD TRANSLOAD, INC., STEVE WASZEN, SR. and STEVE WASZEN, JR., |
| Third-Party Defendants. |

APPEARANCES:

John K. Fiorella, Esq.
CAPEHART & SCATHCHARD, P.A.
Laurel Corporate Center
8000 Midlantc Drive
Suite 300
Mount Laurel, NJ 08054
    Attorney for Plaintiff

Peter C. Harvey
ATTORNEY GENERAL OF NEW JERSEY
    By:  Kevin P. Auerbacher, D.A.G.
        Ruth Carter, D.A.G.
        Christine Lewis, D.A.G.
OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
25 Market Street
P.O. Box 093
Trenton, NJ 08054
    Attorney for Defendant/Third-Party Plaintiff

David M. DeClement, Esq.
LAW OFFICE OF DAVID M. DECLEMENT
55 Simpson Avenue
Pitman, NJ 08071
     Attorney for Third-Party Defendants

**SIMANDLE**, U.S. District Judge:

This dispute centers on the proposed construction of a waste transfer facility on a site located within the Pinelands National Reserve in Mullica Township, New Jersey.  The matter is presently before the Court upon the cross-applications for preliminary injunctive relief by Plaintiff J.P. Rail, Inc., d/b/a/ Southern Railroad Company of New Jersey ("SRNJ" or "J.P. Rail"), and Defendant State of New Jersey, Pinelands Commission ("Pinelands Commission"), as well as the motion to dismiss the Third-Party Complaint by Third-Party Defendants Magic Disposal, Inc., Steve Waszen, Sr., Steve Waszen, Jr., Elwood Brokerage, Inc., and Elwood Transload, Inc.[1]

---

[1] Plaintiff seeks an injunction "enjoining the Commission from preventing or interfering with the construction by SRNJ of an interstate railroad transloading facility on property located at Lots 1 and 2, Block 10801, in Mullica Township, Atlantic County, New Jersey, in violation of the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10101 et seq." (Pl. 5/31/05 Proposed Order.)  Defendant is seeking a preliminary injunction "enjoining plaintiff and third-party defendants from further site preparation and construction on the property located at Lots One and Two, Block 10801, in Mullica Township, New Jersey, until further Order of the court." (Def. 6/6/05 Proposed Order.)  For the sake of clarity, the Court notes that Lots 1 and 2 are actually located in Block 10802 in Mullica Township.  All references to the property hereinafter will be to Block 10802.

The primary issue in this litigation is whether the regulation of the proposed facility is exclusively within the jurisdiction of the Surface Transportation Board pursuant to the Interstate Commerce Commission Termination Act ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (1995) (codified as amended at various locations in 49 United States Code), as claimed by Plaintiff, and, thus, beyond the authority of the Pinelands Commission.  As that question hinges on whether the proposed activities at the facility constitute "transportation by rail carrier," this Opinion will first identify the nature of those activities, and then define the respective roles of the parties in developing and operating the facility.  If the proposed facility is not within the exclusive jurisdiction of the federal Surface Transportation Board, then it would also fall within the Pinelands Commission's regulatory powers, wherein it must comply with the Comprehensive Management Plan ("CMP") of the Pinelands Commission.

After careful consideration, the Court holds first that the proposed facility will probably not involve "transportation by a rail carrier" and, thus, that Defendant will likely succeed on its claim that the Surface Transportation Board does not have exclusive jurisdiction over the regulation of the facility.[2] Additionally, the Court holds that the Pinelands Commission has

---

[2] For this same reason, Plaintiff will not likely succeed on its claim that the STB has exclusive jurisdiction over the proposed facility.

satisfied the remaining elements warranting a preliminary injunction, including a showing of immediate irreparable harm in the absence of injunctive relief precluding further site preparation.  For these reasons, the Court will grant a preliminary injunction in favor of Defendant New Jersey Pinelands Commission, and deny the request by Plaintiff J.P. Rail, Inc. Finally, for reasons explained below, the motion to dismiss by Third-Party Defendants will be denied.[3]

The following constitute the Court's findings of fact and conclusions of law upon the cross-motions for preliminary injunctions, pursuant to Rule 52(a), Fed. R. Civ. P.

I.   **BACKGROUND**

A.   Pinelands National Reserve

The Pinelands National Reserve was established by Congress in 1978 out of recognition that the "approximately 1,000,000 acres of pine-oak forest, extensive surface and ground water resources of high quality, and a wide diversity of rare plant and animal species, provide[] significant ecological, natural, cultural, recreational, educational, agricultural, and public health benefits."  National Parks and Recreation Act ("National Parks Act"), 16 U.S.C. § 471i et seq.; 16 U.S.C. § 471i(a)(1); see Gardner v. New Jersey Pinelands Commission, 125 N.J. 193

_____

[3] Also, Mullica Township moved to intervene on September 13, 2005.  That motion will be treated with separately.

4

(1991) (describing unique ecological, economic, and cultural features of the New Jersey Pinelands National Reserve).

The National Parks Act, 16 U.S.C. § 471i(c), directed the Secretary of the Interior to request the State of New Jersey to develop a Comprehensive Management Plan ("CMP") for the Pinelands National Reserve.  16 U.S.C. § 471i(d); N.J.A.C. 7:50-1 et seq. The Act further directed the Secretary of the Interior to provide technical assistance to the State of New Jersey for the development of the CMP.  16 U.S.C. § 471i(d).

Pursuant to the National Parks Act, the New Jersey State Legislature enacted the Pinelands Protection Act, thereby designating the Pinelands Commission to be the regional planning and management entity contemplated by the National Parks Act. See N.J.S.A. 13:18A-8, -9; N.J.A.C. 7:50-1.11.  The Pinelands Commission implements the CMP and regulates all activities within the Pinelands National Reserve.  See N.J.S.A. 13:18A-6, -27, -29; N.J.A.C. 7:50-8.1.  The CMP provides that those who wish to engage in "development" in the Pinelands National Reserve must first obtain approval from the appropriate local authority and the Pinelands Commission.  N.J.S.A. 13:18A-15; N.J.A.C. 7:50-2.11.  The Pinelands Commission is authorized to institute an action to prevent or restrain a violation of the Pinelands Protection Act and to prevent construction in violation of the Act.  N.J.A.C. 7:50-8.1(a). __

5

"In keeping with the paramount objective of both federal and state governments, i.e., protecting the Pinelands from overdevelopment and consequent ecological degradation, the plan for the Pinelands National Reserve calls for the full participation of federal, state, county, and municipal authorities." Gardner, 125 N.J. at 201.

B.   Site

Steve Waszen, Sr. purportedly acquired Lots 1 and 2 in Block 10802 in the Pinelands Village of Elwood, Mullica Township, Atlantic County ("Site"), located within the Pinelands National Reserve, from the Perona family by quitclaim deeds dated August 15, 2003 and October 21, 2003.[4]  (Dillon Decl. Ex. B.)  On December 16, 2003, a Municipal Consent Order was entered into between Atlantic County, the Township of Mullica and "Steven

---

[4] Ownership of Lots 1 and 2 is presently the subject of a related state court proceeding pending in Superior Court, Atlantic County, New Jersey.  In that action, filed June 2, 2005, the prior owner of the Site, Frank Perona, is challenging Steve Waszen, Sr.'s title to the property, claiming that Waszen and David DeClement fraudulently procured title to the Site.  Frank Perona v. Steven Waszen, David DeClement & J.P. Rail.  (Dillon Decl. Ex. C.)  Mr. DeClement is the attorney for Third-Party Defendants in this case and is the owner of the Elwood Entities, as discussed below.  In short, Perona claims that Waszen, Sr. and DeClement fraudulently misrepresented to Perona that once he sold Lots 1 and 2 to Waszen, Waszen would then "flip" the property to "the Railroad" which, in turn, would lease the property back to Perona for a nominal sum.  According to Perona, Waszen and DeClement represented to him that this transaction would trigger "Federal preemption," thereby allowing Perona to conduct his waste dumping business on the Site.  The complaint alleges that Waszen and DeClement reneged on their agreement and have prohibited Perona from entering onto the property.

Waszen, [Sr.] t/a Magic Disposal," requiring Waszen to "forthwith proceed with a cleanup up" of the Site.[5] (Dillon Decl. Ex. G.) Both Waszen, Sr. and DeClement signed the Consent Order.[6]  (Id.)

Pursuant to paragraph 4 of the Consent Order, Waszen, Sr. and Magic agreed not to bring any solid waste or recyclable materials onto the property.  The Consent Order further provides that resumption of use or development of the Site would "be subject to compliance with and proceed in accordance with all [applicable laws] including but not limited to . . . New Jersey Pinelands Commission regulations . . . ."[7] (Martin Decl., Ex. 4, ¶ 1.)  The order also states:

> No additional solid waste or recyclable materials may be brought to the property for storage, processing or other purposes by any party.  This prohibition shall include materials dumped on the ground and materials stored in roll off container from any other source or other property.

---

[5] Magic Disposal, Inc. ("Magic" or "Magic Disposal") is, according to the Amended Third-Party Complaint, a New Jersey Corporation "that operates as a solid waste transporter and a solid waste transfer station."  (Am. Third-Party Compl. ¶ 6.)  At oral argument, Plaintiff's counsel informed the Court that Magic Disposal, Inc. is wholly owned by Waszen, Sr.

[6] Not only did Mr. DeClement represent to the Court at the hearing that he did not sign the Consent Order, he denied that his client Magic Disposal, Inc. was named as a defendant therein. Both representations were shown to be false.

[7] On January 27, 2005, Magic Disposal's permit to operate a solid waste transfer station in Egg Harbor Township, New Jersey was revoked by the New Jersey Department of Environmental Protection for noncompliance with the New Jersey Solid Waste Management Act.  (Def. Mtn. To File Am. Third-Party Compl., Ex. 2-A.)

(Id. ¶ 7.)  Finally, the consent order prohibits any activity at the Site, "except in connection with implementation of clean up operations," and provides that "[a]ny other uses or activity occurring at the site shall cease."  (Id. ¶ 11.)  This prohibition was duly filed with the Atlantic County Clerk and remains of record, as confirmed at the hearing in this case.[8]

On January 19, 2005, Waszen, Sr. and Waszen, Jr. entered into two separate deed agreements purporting to transfer ownership of Lots 1 and 2 to Waszen, Jr.  (Martin Decl. Ex. 14.) The transfer of each lot was made for one dollar.  (Id.) Curiously, on December 30, 2004, before ownership of the property was ostensibly transferred to Waszen, Jr., a ground lease was entered into between Waszen, Jr. as landlord, and SRNJ as tenant.[9] (Dillon Decl. Ex. A.)  The relevant terms of the ground lease are as follows:

- This lease shall become effective on December 31, 2004 and shall be for an initial period of two (2) consecutive 10 year terms with option to terminate after the first ten and then with five year renewal period options with five (5) five year renewal periods with the agreement terminating without further renewal after 45 years.  The Lessee shall be deemed to have accepted and be liable for each consecutive yearly option if he/she does not give written notice to Lessor 60 days prior to the expiration of each term.  (¶ 1.)

---

[8] At the hearing Mr. DeClement was adamant in representing to the Court that the Consent Order had never been recorded. That representation was false.

[9] Joseph F. Petaccio, Jr., President of J.P. Rail, Inc., signed the ground lease agreement on behalf of SRNJ.

- Subject to Lessor's compliance with all the terms and provisions of this Lease, Lessor shall pay the following rent:

  a. from the Lease Commencement Date throughout the initial period at the rate of $1.00 (one dollar) and other good and valuable considerations payable in advance for ten years on the date the lease signed and executed, Lease and any extensions thereto shall be effective each ear and in anniversary of the Lease Commencement Date.

  b. the Lessor shall be responsible for the payment of Class II railroad taxes as assessed by the State of New Jersey and no other fees or expenses.[10] (¶ 2.)

- Landlord agrees that it will construct any buildings necessary to carry out the enterprise at its own expense and shall, if necessary, obtain the local approvals which may consist of appearing before local land use boards and or abide by those obligations pertaining to the rights and obligations of a railroad facility.  (¶ 4.)

- Lessor shall keep the improvements on the Premises insured under Lessor's blanket insurance program, against loss or damage due to fire or windstorm and with what is commonly known as comprehensive coverage. . . .  Lessee agrees to maintain in effect throughout the term of this Lease comprehensive general liability and property damage under its blanket insurance program, covering the Premises and the business to be conducted by Lessee thereon, in limits not less than $1,000,000 combined single limit for each occurrence.  (¶ 11.)

- Lessee further agrees to indemnify, keep and hold Lessor harmless from and against liability for loss or damage, including attorney's fees and court costs with respect to injury to persons and damage to property on the Premises arising in connection with the operation of the Premises

---

[10] Though paragraph 6 of the ground lease agreement states to the contrary – that Lessee shall pay all Class II Railroad taxes assessed by the State of New Jersey – Plaintiff and Third-Party Defendants do not dispute that the agreement requires Waszen to pay all New Jersey Class II Railroad taxes.

by Lessee effective as of the Lease Commencement Date and
during the term of this Lease and any extension or option
period thereof, except for loss or damage caused by
Lessor, its employees, contractor, agents or persons
otherwise affiliated with Lessor.  (<u>Id.</u>)

- Nothing contained herein shall be deemed construed by the
  parties hereto, or by any third party, as creating the
  relationship of principal and agent, a partnership, or a
  joint venture between the parties hereto, it being
  understood and agreed that neither the provisions
  contained herein nor any acts of the parties hereto,
  shall be deemed to create any relationship between the
  parties other than the relationship of Lessor and Lessee.
  (¶ 32.)

C.   <u>Lica Facility</u>

In or about the beginning of 2003, David DeClement, on

behalf of Magic Disposal, contacted SRNJ and recommended that a

waste facility be set up at the Site for Magic to ship waste.

(Martin Decl. Ex. 17, Collard Dep. Tr. at 37:14- 38:13.)   By

letter dated May 11, 2005, SRNJ notified Mullica Township of its

intention to construct a waste disposal facility ("Lica Facility"

or "Facility") on the Site.  SRNJ has identified its proposed

waste disposal facility as a "transload facility."  According to

Plaintiff, "[a] transloading facility is a facility designed to

enable the transfer of freight from trucks to trains and trains

to trucks."  (Pl. Br. at 2. n.1.)  Plaintiff maintains that the

Lica Facility will not handle liquid waste or hazardous waste.

(<u>Id.</u> at 4.)  Rather, SRNJ proposes to transload containers of

municipal solid waste and dry goods to railcars bound for

destinations in interstate commerce.  More specifically, SRNJ

10

asserts that it will handle materials such as lumber, finished goods, recyclable, and as well as municipal solid waste such as construction and demolition debris.  (Id. at 8.)

As used by SRNJ, "municipal solid waste" ("MSW") is a generic term that includes materials of every kind that are neither liquid nor hazardous.  According to SRNJ, there are two types of MSW, putrescible waste and non-putrescible waste.  SRNJ asserts that it will only accept the former if it arrives to the Facility in airtight sealed containers.  (Id. at 9.)  SRNJ will then directly load the sealed container onto a flatcar or transfer it to another sealed container.  SRNJ assures that at no time will putrescible waste be dumped on the tipping floor or be stored at the Facility.  If, on the other hand, the material is non-putrescible, SRNJ will first place it on the tipping floor.[11] Next, SRNJ will remove the recyclables to be prepared for separate shipment in boxcars.  Similarly, all metals will be removed prior to loading so as to prevent damage to the railcars. (Id. at 10.)

Finally, SRNJ maintains that the remainder of the waste will be loaded into the appropriate container for shipment.  According to SRNJ, for each type of commodity handled at the Facility, SRNJ will utilize the appropriate railcar for transportation.  For

---

[11] The same is true for construction and demolition waste. (Pl. Reply Br. at 10.)

example, SRNJ maintains that for finished goods, boxcars will generally be used; lumber providers will use lumber flatcars; construction and demolition material will be shipped in tarped gondola cars; and MSW will be transported in airtight sealed containers which will then be placed on a flatcar.[12] (Id. at 9.) Once the cars arrive, the shipper will be instructed to bring the commodity to the Facility to be appropriately prepared for shipment.

Importantly, almost none of the waste will initially be transloaded in closed containers from truck to railroad car. Instead, as confirmed by Plaintiff's counsel at the hearing, the dominant portion of SRNJ's initial hauling contracts involve construction wastes and recyclables which will be dumped on the tipping floor before being loaded into rail cars for shipment. (See also Pl. Br. at 10.)

Defendant New Jersey Pinelands Commission characterizes the proposed facility in different terms.[13] Defendant maintains that

_____

[12] Though Thomas Collard, Vice President of J.P. Rail, testified at his deposition that SRNJ has purchased three additional locomotives to handle waste at the Facility, (Martin Decl, Ex. 17, Collard Dep. Tr. 128:18-25,) it is not clear from the record whether J.P. Rail owns all of the railcars that will be used for waste shipment. According to SRNJ, "[r]egarding the actual loading of materials to be shipped, the shipper arranges to have the appropriate cars arrive at the facility to accept the materials for shipment." (Pl. Reply Br. at 9 (citing SRNJ Certification at ¶¶ 12-13).)

[13] In the first instance, Defendant notes that the State of New Jersey has revoked Plaintiff's corporate status and, thus,

the Facility "will operate as a solid waste transfer station – involving sorting, segregating, and processing of solid waste – and not as a transloading facility that involves the mere loading and unloading of materials."[14] (Def. Supp. Br. at 6.)  This Court agrees that the facts support the Commission's characterization.

D.   New Jersey Transit Spur

On April 10, 1987, SRNJ's predecessor, the Shore Fast Line, entered into a Trackage Rights Agreement with New Jersey Transit Corporation ("New Jersey Transit") to obtain trackage rights for rail line owned by New Jersey Transit.  Pursuant to that agreement, SRNJ may contract with other industries for the construction of "freight facilities" only after receiving permission from New Jersey Transit.  (Martin Decl. Ex. 25.)  To date, New Jersey Transit has withheld the necessary approvals to begin construction of a rail spur connecting the Facility to the railroad line.  Without the spur, no waste can be transported from the Facility by rail.

---

Plaintiff has no authority to conduct any business in the State of New Jersey.  (Pl. Supp. Br. at 10.)  J.P. Rail argues that it has entered into an agreement with the State to resolve any issues of this sort.  (August 31, 2005 ltr., at Dieck Decl. Ex. D.)

[14] Under New Jersey law, a "transfer station" is defined as "a solid waste facility at which solid waste is transferred from one solid waste vehicle to another solid waste vehicle, including a rail car, for transportation to an off-site solid waste facility, or a solid waste facility at which [certain kinds of] liquid waste (as defined at N.J.A.C. 7:26-2.13(h)) is received, stored, treated or transferred[] . . . ."  N.J.A.C. 7:26-1.4.

13

By letter dated March 14, 2005, David Dieck, Director of Rail Contracts Administration for New Jersey Transit since May 12, 2003, (Dieck Decl. ¶ 1,) informed  Thomas Collar, Vice President of J.P. Rail, that N.J. Transit had approved the plans submitted by J.P. Rail for the spur.  (Agrawal Decl. Ex. B.) Accordingly, Mr. Dieck requested from Mr. Collard an advance payment of $257,225.00.  (Id.)  On May 6, 2005, Mr. Fiorilla, counsel for J.P. Rail, sent to Mr. Dieck the advance payment as well as a signed agreement accepting N.J. Transit's "terms for construction."  (Agrawal Decl. Ex. A.)  By letter dated June 3, 2005, Mr. Dieck requested from Joseph Petaccio, President of SRNJ, certain detailed information pertaining to the proposed business activity at the Site.  (Agrawal Decl. Ex. I.)  That letter stated:

> You should be advised that NJ Transit is required to seek all requisite approvals from the Pinelands Commission pursuant to N.J.A.C. 7:50-1.1 et seq.  Until such approval is obtained no permit [to install a new turnout and siding] may be issued and no work may proceed.

(Id.)

By letter dated July 19, 2005, Mr. Dieck informed Mr. Fiorilla that New Jersey Transit had not as of that date received the information that it requested on June 3, 2005.  The letter stated: "NJ Transit cannot advance the proposed project at this point and therefore is returning the deposit it received from the account of Capehart and Scatchard" in the amount of $257,225.00.

14

(Id.)  On July 22, 2005 Mr. Fiorilla returned by mail the $257,225.00 check to New Jersey Transit.  (Dieck Decl. Ex. B.) That letter additionally provided certain information regarding the nature and volume of the commodities to be shipped to and from the Facility.  Mr. Fiorilla noted that the Facility also hoped to "store carloads of plastic pellets and other bulk products for reshipment."  (Id.)

Mr. Dieck informed Mr. Fiorilla by letter dated August 19, 2005 of New Jersey Transit's position that J.P. Rail would have to enter into a "Sidetrack Agreement" with New Jersey Transit separate and apart from the existing Trackage Rights Agreement between the parties.  (Dieck Decl. Ex. C.)  The letter then listed detailed requests for certain additional information regarding the site plans and operation of the proposed facility. Finally, Mr. Dieck acknowledged receipt of the $257,225.00 deposit, and stated:

> In light of [New Jersey Transit's] concerns, and to avoid further exchanges of the deposit, [New Jersey Transit] will hold your check without incurring any liability or obligation in connection therewith until such time as you request its return or until we complete our evaluation of the proposed project, whichever occurs earlier.  Please provide the information requested by this letter within 45 days so we may continue to evaluate your request to install a sidetrack on NJ TRANSIT'S property and to operate a new freight service on the Atlantic City Rail Line.  NJ TRANSIT reserves the right to reject the proposed sidetrack project or exercise any other rights it may have under the Trackage Rights Agreement if its concerns about this project are not addressed to its complete satisfaction.

(Id.)  On August 31, 2005, Mr. Fiorilla mailed a letter to Mr. Dieck providing certain information regarding the operation of the proposed facility.  (Dieck Decl. Ex. D.)  Mr. Fiorilla additionally noted J.P. Rail's position that a separate side track agreement was not necessary in light of the Trackage Rights Agreement already in place.  (Id.)

By letter dated September 30, 2005, Mr. Dieck responded to Mr. Fiorilla's August 31, 2005 letter.  Mr. Dieck notified Mr. Fiorilla that "a critical aspect of your client's operating plan is fundamentally flawed" and, thus, that J.P. Rail's proposed plane was "unacceptable."  (Dieck Decl. Ex. E.)  Accordingly, Mr. Dieck again returned the $257,225.00 deposit to Mr. Fiorilla. The following month, on October 12, 2005, Mr. Dieck mailed to Mr. Fiorilla a letter expressing his concern once again that J.P. Rail had yet to provide information altering New Jersey Transit's decision that the proposed plan was "unacceptable."  (Def. Ex. 1.)  Mr. Dieck therefore requested "a detailed written explanation, including diagram, of how SRNJ will operate without fouling NJ TRANSIT's Lica Siding."  Finally, Mr. Dieck once again clarified:

> Although there are a number of outstanding issues
> related to this project in addition to those addressed
> in this letter, pursuant to your request NJ TRANSIT
> will hold your deposit check, until operational,
> contractual and regulatory issues are addressed to our
> satisfaction.  However, we will return the check upon
> your request.  NJ TRANSIT's retention of the deposit
> check should not be construed as an acceptance of any

previously submitted construction plans, the operating plan or request to construct the siding on our property.[15]

(Id.)

    E.    <u>Additional Agreements Related to Operation of the Facility</u>

As already noted, the lots comprising the Site were allegedly acquired on or about August 15, 2003 and October 21, 2003 by Third Party Defendant Steve Waszen, Sr.[16] (Def. Supp. Br. at 6.)  On July 25, 2003 and October 15, 2003 respectively, Elwood Transload, Inc. and Elwood Brokerage, Inc. (collectively "Elwood Entities") were incorporated.  According to the certificate of incorporation of each, Waszen, Sr. and Jr. comprised the original board of directors.  (Martin Decl. Exs. 20, 21.)  Counsel for Third-Party Defendants explained to the Court at oral argument that the Elwood Entities were incorporated exclusively for purposes of operating the Facility.

On December 30, 2004, Waszen, Jr. and Plaintiff executed a ground lease of the Site for $1.00 for each of two ten year terms.[17] (Martin Decl., Ex. 13.)  On that same date, two

---

[15] Counsel for Plaintiff and Third-Party Defendants misrepresented to the Court at oral argument that New Jersey Transit has, in fact, deposited the check.

[16] The Municipal Consent Order between Atlantic County and the Township of Mullica and "Steven Waszen, t/a Magic Disposal," was entered into on December 16, 2003.

[17] The deed purporting to transfer the property from Steve Waszen to Steve Waszen, Jr. is dated January 19, 2005.  (Martin Decl., Ex. 14.)

additional agreements were executed: (1) a Railroad Car Loading Agreement between Elwood Transload, Inc. (signed on behalf of Elwood Transload, Inc. by Steve Waszen, Sr.) and Plaintiff; and (2) a Facility Capacity Agreement between Elwood Brokerage, Inc. (also signed by Steve Waszen, Sr.) and Plaintiff.  Both agreements have the same potential duration as the ground lease between Waszen, Jr. and SRNJ.  (Martin Decl. Ex. 15 ¶ 4.1; Id. Ex. 16 ¶ 2; Dillon Decl. Ex. A ¶ 1.)

On June 17, 2005, during the pendency of this litigation, two corporate resolutions were executed between Waszen, Sr. (listed as director for both Elwood Entities) and David DeClement, Esq., counsel for Third-Party Defendants, purportedly transferring all interest in the Elwood entities to DeClement. (Martin Decl, Exs. 21, 22.)  Though the agreements do not specify what consideration was given by Mr. DeClement in exchange for the interest in the Elwood Entities, Third-Party Defendants concede that the transfers were made for only one dollar.  (Martin Decl. Ex. 23, Answers to Def. Interog. #4.)

The agreements between J.P. Rail and the Elwood entities contain provisions insulating J.P. Rail from liability.  Pursuant to the Loading Agreement,

> [Elwood Transload] will be responsible for and will indemnify, save harmless and defend SRNJ against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, damage to or loss of property of SRNJ, [Elwood Transload], or agents, servants or

> employees of either, or of any other person, and
> against and from any and all claims and suits for, and
> any and all liability, loss or expense arising from or
> incidental to or in connection with, injury to or death
> of persons, including agents, servants, or employees of
> SRNJ or of Loader, or any other person (including
> Loader, if a natural person), which said damage, loss
> injury or death shall arise in any manner, directly or
> indirectly, out of or incidental to or in connection
> with, any act or omission relating to the use or
> occupation of the Facility or exercise of this
> Agreement by Loader, except to the extent caused by the
> negligence of SRNJ or other entities allowed to use the
> Facility by SRNJ.

(Martin Decl. Ex. 15, ¶ 9.1)  The Capacity Agreement contains

identical language.  (Martin Decl. Ex. 16, ¶ 8.)  Thus, in all

important respects, the Elwood Entities are bearing the major

risks and costs of this operation, on land allegedly owned by

Waszen, Jr., not by J.P. Rail.  The railroad intends to derive

revenue for hauling the loaded railcars away from the Facility

under haulage agreements, playing no role in the delivery,

sorting or loading of waste in the Facility.

    F.   Procedural History

    On May 31, 2005 Plaintiff filed its complaint against the

State of New Jersey Pinelands Commission, seeking an injunction

pursuant to ICCTA enjoining the Commission from preventing or

interfering with the construction by SRNJ of the Facility.  On

June 6, 2005 Defendant filed its answer and counterclaim, as well

as a third-party complaint against Magic Disposal, Inc., Steve

Waszen, Sr. and Steve Waszen, Jr., seeking a preliminary

injunction enjoining Plaintiff and Third-Party Defendants from

site preparation and construction on the Site until further order
of the Court.[18] Defendant Pinelands subsequently moved, and was
granted permission, to join the Elwood Entities as additional
Third-Party Defendants.  In short, Defendant claims that
Plaintiff and Third-Party Defendants failed to obtain the
appropriate regulatory approvals in violation of the National
Parks and Recreation Act of 1978, 16 U.S.C. § 471i, the Pinelands
Protection Act, N.J.S.A. 13:18A-1 et seq., and the Pineland
Commission's CMP, N.J.A.C. 7:50-1 et seq.  Additionally,
Defendant seeks relief as a third-party beneficiary of the May 6,
2005 contract between Plaintiff and New Jersey Transit as well as
the December 16, 2003 Municipal Consent Order.

On June 15, 2005, the parties executed a Consent Order
prohibiting all further activities at the Site – except for
cleanup activities in accordance with prior Municipal Consent
Orders – pending the return date of the Orders to Show Cause.[19]

On July 14, 2005, the Pinelands Preservation Alliance
("PPA") moved for leave to file an amicus curiae brief, which the
Court granted by order dated September 16, 2005.  By the same

---

[18] Defendant filed an amended answer and counterclaim/third-
party complaint on June 16, 2005 to correct a "scrivener's error"
in its original pleading misidentifying the Block number of the
Site as 10801.

[19] As noted above, two days later, on June 17, 2005, Waszen
purportedly transferred all interest in Elwood Transload, Inc.
and Elwood Brokerage, Inc. to David DeClement.

Order, the Court permitted the PPA to participate in the preliminary injunction hearing.

On August 18, 2005, the Court convened a scheduling conference at which time the Court gave permission to the Pinelands Commission to take depositions, as well as serve interrogatories on the Elwood Entities in lieu of depositions. At that time, the Court also set the preliminary injunction hearing for October 19, 2005, on which date the Court heard extensive oral argument and factual proffers of counsel in lieu of testimony.

## II.   CROSS-APPLICATIONS FOR PRELIMINARY INJUNCTIVE RELIEF

### A.   Ripeness

Plaintiff and Defendant have each moved for a preliminary injunction.  Before addressing the merits of the cross-applications, the Court must first consider whether, in light of J.P. Rail's failure to yet obtain New Jersey Transit's permission to build the necessary rail spur, the matter is ripe for review. The issue of ripeness is applicable to cases, such as this, involving motions for a preliminary injunction.  Nextel Communications of the Mid-Atlantic, Inc. v. City of Margate, 305 F.3d 188, 192 (3d Cir. 2002) (citing Acierno v. Mitchell, 6 F.3d 970, 973 (3d Cir. 1993)).  Even though none of the parties here has invoked the ripeness doctrine, the Court must nonetheless address the issue.  Nextel, 305 F.3d at 192 (citing Felmeister v. Office of Attorney Ethics, 856 F.2d 529 (3d Cir. 1988)).

"[T]he ripeness doctrine, like other justiciability
doctrines, derives ultimately from the requirement in Article III
of the United States Constitution that federal courts are only
empowered to decide cases or controversies.  Even when the
constitutional minimum has been met, however, prudential
considerations may still counsel judicial restraint."  Nextel,
305 F.3d at 192 (quoting Felmeister, 856 F.2d at 535) (internal
quotations omitted).  Where the party aggrieved seeks injunctive
relief as here, since that remedy is discretionary the court
should hesitate to apply it unless (a) the issues are fit for
judicial resolution and (b) withholding judicial consideration
would result in hardship to the parties.  A.O. Smith Corp. v.
F.T.C., 530 F.2d 515, 521 (3d Cir. 1976) (citing Abbot
Laboratories v. Gardner, 387 U.S. 136, 149 (1967)).

Both parties here urge the Court to adjudicate their cross-
motions.  Initially, the Court holds that the issues presently
before the Court are fit for judicial resolution.  "Whether a
question is fit for judicial review depends upon factors such as
whether . . . the issue presented for decision is one of law
which requires no additional factual development . . . ."
Nextel, 305 F.3d at 193.  A preliminary injunction will not issue
in the absence of (1) a likelihood of success on the merits and
(2) immediate irreparable harm in the absence of injunctive
relief.  KOS Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700,

708 (3d Cir. 2004).  Here, the Court holds in the first instance
that the factual record has been sufficiently developed for
purposes of determining the parties' likelihood of success of the
merits.  To be sure, a central issue to this litigation – whether
the facility will involve "transportation by a rail carrier" –
will be resolved if New Jersey Transit decides in the future not
to permit construction of the rail spur.  However, as the Court
discusses more fully below, it is unlikely that the Facility will
qualify for ICCTA preemption even if the spur is built.

Similarly, the Court's irreparable harm analysis does not
depend on further factual development.  Indeed, as explained
infra, the absence of the rail spur at present forms the basis of
the Court's conclusion that J.P. Rail will not suffer immediate
irreparable harm if an injunction is not issued in its favor.

Next, the Court holds that deferring adjudication of this
matter could cause the parties hardship.  "[I]n order for the
parties' hardship to be sufficient to overcome prudential
interests in deferral, that hardship must be both immediate and
significant."  Nextel, 305 F.3d at 194 (quoting Felmeister, 856
F.2d at 537).  As the Third Circuit has explained:

> One reason for scrutiny of the "hardship to the
> parties" aspect of the ripeness formula is that the
> factual complex – but not necessarily all of it –
> relevant to hardship will also be relevant to the
> question of "irreparable injury" which must be
> satisfied, should it be reached, before an injunction
> may issue.  We perceive the two concepts – "hardship to
> the parties" and "irreparable injury" – to be

jurisprudential cousins, not identical twins.  The same
analytical factors may or may not support each concept;
the context in which the factors are utilized is
critical.  Thus, certain factors will dominate in
considering hardship to the parties, while different
factors may be critical in considering irreparable
injury for purposes of issuing a preliminary
injunction; still other actors may come into play when
irreparable harm is considered in the context of a
request for a permanent injunction.

A.O. Smith Corp., 530 F.2d at 522.  Here, because Plaintiff and
Defendant have each moved for a preliminary injunction, the Court
will treat each party separately.

First, the Court holds that the potential hardship to J.P.
Rail will be sufficiently direct and immediate, arising from
legal uncertainty of its rights and obligations.  J.P. Rail is
ready to begin construction of the Facility.[20] If J.P. Rail were
to suspend its construction, and the Court subsequently granted
its proposed injunction, the resultant delay could unnecessarily
stifle SRNJ's efforts to secure potential customers.
Specifically, if the market for interstate waste transport is as
burgeoning as counsel for J.P. Rail has led this Court to
believe, the prospect that Plaintiff may lose substantial
business to other facilities if its project is delayed is great.

If, on the other hand, SRNJ begins construction now, only to
have a future adverse ruling by the Court make operation of the

---

[20] Indeed, the matter is before the Court upon SRNJ's
application for a preliminary injunction and declaratory order
enjoining the Commission from interfering with the construction
of the proposed facility.

transload facility unfeasible, J.P. Rail would also be unnecessarily harmed.  In sum, in either scenario outlined above, deferring adjudication of this matter could cause J.P. Rail direct and immediate substantial hardship.  See Abbot Laboratories, 387 U.S. at 152-53 (holding hardship sufficiently direct and immediate where compliance as well as noncompliance with FDA regulation could cause severe and unnecessary harm).

The Court similarly concludes that deferring adjudication on the Defendant's motion would cause Defendant significant hardship.  As already noted, in the absence of a preliminary injunction favoring the Pinelands Commission, J.P. Rail would likely commence construction of the Facility.  However, construction activities alone could have an adverse impact within the Pinelands National Reserve.  Specifically, as Amicus has pointed out to the Court, the Kirkwood-Cohansey aquifer underlies the Pinelands National Reserve.  (Amicus Br. at 3.)  The aquifer is a source of drinking water for most of South Jersey and provides most of the freshwater recharge to wetlands and streams in the Pinelands National Reserve.  (Id.; Montgomery Decl. ¶ 5.) Because the aquifer begins at or just below the Pinelands National Reserve's sandy, porous ground surface, it is particularly vulnerable to contamination.  (Id.)  Therefore, if the Court defers adjudication of Defendant's motion and J.P. Rail begins construction, the Pinelands National Reserve likely will

25

be at risk immediately.  Prudential interests in deferral are, thus, outweighed by the hardships that would befall Defendant if an adjudication is delayed.

For the foregoing reasons, the Court concludes that (1) the instant matter presents a case or controversy in the constitutional sense, and (2) prudential concerns dictate that this Court not defer its adjudication.

Having determined that the matter is ripe for judicial resolution, the Court must next examine whether Plaintiff and Defendant are entitled to preliminary injunctive relief.  A party seeking a preliminary injunction must show:  (1) a likelihood of success on the merits; (2) that the moving party will suffer immediate irreparable harm in the absence of injunctive relief; (3) that granting preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief.  KOS Pharmaceuticals, 369 F.3d at 708.[21] Because the relief requested by Plaintiff here is the converse of that sought by Defendant, the logical starting point is a discussion of the merits.  As that determination depends primarily on whether the Facility involves "transportation by rail carrier" under ICCTA, the Court will now turn its attention to the relevant statutory provisions.

---

[21] Discretion lies with the Court to perform the "delicate balancing" of these factors, no one factor being necessarily determinative.  Constructors Ass'n of W. Pennsylvania v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978).

B.   <u>Likelihood of Success on the Merits</u>

ICCTA abolished the Interstate Commerce Commission ("ICC") and created the Surface Transportation Board ("STB"), an independent agency within the Department of Transportation charged with the exclusive jurisdiction over "transportation by rail carriers."  49 U.S.C. § 10501(b).  ICCTA provides, in relevant part:

> (b) The jurisdiction of the Board over –
>
>     (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
>     (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

ICCTA defines "transportation" as including:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

27

49 U.S.C. § 10102(9).  The statute defines "rail carrier" as "a person providing common carrier railroad transportation for compensation, but does not include street, suburban, or interurban electric railways not operated as part of the general system of rail transportation."[22] 49 U.S.C. § 10102(5).

ICCTA vests the STB with exclusive jurisdiction over "transportation by rail carrier," "and its regulation of rail carriers preempts state regulation with respect to rail transportation."  Hi Tech Trans, LLC v. State of New Jersey, 382 F.3d 295 (3d Cir. 2004) (citing 49 U.S.C. § 10501(b)).  "Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'manag[ing] or 'govern[ing]' rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation."  Florida East Coast Ry. v. City of West Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001) (citations omitted.)  In other words, exclusive STB jurisdiction "is limited to remedies with respect to rail regulation – not State and Federal law generally."  H.R. Rep. 104-422, reprinted in 1995 U.S.C.C.A.N. 850, 852.

In Hi Tech Trans, 382 F.3d 295, the issue was whether the state regulation of activities conducted at Hi Tech's solid waste

---

[22] It is undisputed that SRNJ is a rail carrier under ICCTA.

disposal facility in Newark, New Jersey were preempted by ICCTA.
The facility in Hi Tech was operated under a License Agreement
with the railroad whereby Hi Tech would be permitted to use a
portion of the railroad's rail yard for transloading, but would
be solely responsible for constructing and maintaining the
facility.  In short, the license agreement there essentially
eliminated the railroad's involvement in, and responsibility for,
the operation of Hi Tech's facility.[23]

Hi Tech brought suit in United States District Court for the
District of New Jersey seeking a declaration that state laws
regulating its operation were preempted by ICCTA.  Hi Tech
additionally sought a preliminary injunction, based upon its
claim of preemption, enjoining an administrative enforcement
proceeding initiated against it by the New Jersey Department of
Environmental Protection.  In denying the relief sought by Hi
Tech, the Third Circuit held:

> [T]he most cursory analysis of Hi Tech's operations
> reveals that its facility does not involve
> "transportation by rail carrier."  The most it involves
> is transportation "to rail carrier."  Trucks bring
> [construction and demolition] debris from construction
> sites to Hi Tech's facility where the debris is dumped

---

[23] The Hi Tech facility operated as follows: (1) trucks
hauling construction and demolition waste arrived at the
facility; (2) the trucks discharged that waste into hoppers
provided by Hi Tech; and (3) the waste was then loaded directly
from the hoppers into rail cars owned by Canadian Pacific
Railroad.  Once the cars were filled, the railroad transported
them to out-of-state disposal facilities.  Hi Tech, 382 F.3d at
299.

> into Hi Tech's hoppers.  Hi Tech then "transloads[]"
> the [construction and demolition] debris from its
> hoppers into rail cars owned and operated by . . . the
> railroad.  It is [the railroad] that then <u>transports</u>
> the [construction and demolition] debris "by rail" to
> out of state disposal facilities.

382 F.3d at 308.  <u>See</u> <u>I.C.C. v. Texas</u>, 479 U.S. 450, 457 (1987)

(holding under ICCTA's predecessor statute that "transportation

by rail carrier" includes "service provided by interstate rail

carriers on '<u>equipment which they own</u>'").

The facts here are similar to those in <u>Hi Tech</u>.[24] In that

case the loader was permitted to use a portion of the railroad's

property for transloading; here, the loader is using land leased

by the railroad to conduct the proposed waste transfer

activities.[25] In <u>Hi Tech</u>, the facility operator financed the

construction and maintenance of the facility; here the Elwood

Entities appear to be almost exclusively responsible for funding

the facility's development and operational costs, including all

---

[24] The Court will assume, for present purposes only, that the
proposed activities will constitute "transportation" under ICCTA.
Once again, ICCTA defines "transportation" as including "services
related to that movement, including receipt, delivery, elevation,
transfer in transit, refrigeration, icing, ventilation, storage,
handling, and interchange of passengers and property."  49 U.S.C.
§ 10102(9).

[25] In fact, as already explained, the original party in
interest in the Elwood Entities, Waszen, Sr., was also the
original owner of the property.  Moreover, J.P. Rail is only
paying $1 in rent for the first twenty years of its ground lease
with Waszen, Jr.  That the loader, rather than the railroad, in
essence owns the property on which the loading activities take
place even further supports the applicability of the holding in
<u>Hi Tech</u> to this case.

state Class II railroad taxes, engineering fees, (Martin Decl.
Ex. 17, Collard Dep. Tr. 127:18-24,) and the $257,225 deposit to
New Jersey Transit.[26] (Id. at 177.)  Finally, in Hi Tech the
licensing agreement between Hi Tech and the railroad disclaimed
any liability by the railroad for Hi Tech's operations; here, the
agreements between SRNJ and the Elwood Entities essentially
eliminate the railroad's liability for damage caused by the
operation of the facility.[27] In short, Third-Party Defendants
will "simply use[] [the railroad's] property to load . . . debris
into/onto [the railroad's] railcars.  The mere fact that the
[railroad] ultimately uses rail cars to transport the . . .
debris [Third-Party Defendants] load[] does not morph [Third-
Party Defendants] activities into 'transportation by rail
carrier.'" Hi Tech, 382 F.3d at 309.

---

[26] Mr. Collard of J.P. Rail acknowledged that J.P. Rail has
committed few resources towards the construction or operation of
the Facility.  (Martin Decl. Ex. 17, Collard Dep. Tr. 128:1-20.)
To be sure, Mr. Collard testified that SRNJ purchased three new
locomotives to transport waste at the Facility.  (Id. at 128:18-
25.)  However, this fact only serves to support the Court's
conclusion that the Facility here will involve transportation to,
not by, J.P. Rail.  Moreover, that the ground lease requires SRNJ
to pay only $1 in rent for the first twenty years of the
agreement further illustrates that J.P. Rail's investment in the
facility is nominal, especially considering that Waszen, Sr.
spent in excess of $2 million cleaning up the Site.  (Martin
Decl. Ex. 12, Waszen, Sr. Dep. Tr. at 116:1-4.)

[27] To be sure, SRNJ claims that its agreement with Elwood
Transload, Inc. illustrates that Elwood will be acting as J.P.
Rail's agent.  However, as the Third Circuit recognized in Hi
Tech, 382 F.3d at 308 n.18, parties can not contractually
determine their status for preemption purposes under ICCTA.  That
is especially true where, as here, the actual relationship
between the parties sounds in something other than agency.

SRNJ argues that the proposed facility here is more akin to the one at issue in Canadian Nat'l Railway Co. v. City of Rockwood, Docket No. 04-40323 (E.D. Mich., June 1, 2005).  (Pl. Ex. C.)  There, Canadian National Railroad had contracted with a third-party to perform the actual operation of the equipment at its transloading facility.  The court held that despite the agreement with a third-party contractor, Canadian National was the party providing the transloading services and, thus, that the activities occurring at the transload facility were subject exclusively to the STB's jurisdiction.  See also 36 N.J. Reg. 5105 (Nov. 15, 2004) (recognizing regulation of transload and transfer operations federally preempted even though conducted by third parties "as long as those activities [are] being conducted on behalf of the rail carrier as part of its rail transportation services").  Here, however, for the reasons just explained, Elwood's activities are not being conducted on behalf of SRNJ. Canadian Nat'l is, thus, distinguishable from this case and, in any event, Hi Tech, being a decision of the Third Circuit, is binding precedent upon this Court.

For the foregoing reasons, the Court concludes that, as in Hi-Tech, the Facility here likely involves "transportation to rail carrier" rather than "transportation by rail carrier."[28]

---

[28] The Court also notes that the December 16, 2003 Municipal Consent Order may act as a further impediment to the Facility's ability to operate as a transportation facility.  Specifically,

Moreover, the parties agree that the proposed facility is not permitted under the CMP.[29] Accordingly, Defendant has demonstrated a likelihood of success on its claim that the regulation of the Facility does not qualify for ICCTA preemption.[30]

_____

if, as Defendant argues, that order creates an equitable servitude enforceable against Plaintiff, Plaintiff and Third-Party Defendants may be prohibited from using the Site as a solid waste transfer facility.  In such a case, the Facility could not provide transportation services triggering ICCTA preemption.  That restriction, duly filed, had been signed by Waszen, Sr., and was not extinguished magically by Waszen, Sr.'s transfer of the property to his son for $1.00.  Third-Party Defendants have provided no support for their assertion that the Consent Order has been nullified.

[29] Plaintiff concedes that the Facility will not fall within the limited exception carved out for transfer stations handling no more than 25 tons of waste per day.  Rather, the Facility will be operated at a level approximately ten times greater than that permitted by the CMP.  (Stokes Decl. ¶ 6.)  The parties do dispute, though, whether the Facility will harm water resources or violate New Jersey's air quality standards, see N.J.A.C. 7:50-6.93, or if it will meet requirements governing soil contamination.  (Dunfee Decl. ¶¶ 5-9; Pl. Reply Br. at 4.)  Such questions are not decided in this Opinion.

[30] While this conclusion ends the Court's preemption analysis for present purposes, the Court notes that the STB has previously recognized that section 10501(b) of ICCTA is compatible with certain environmental statutes.  Boston and Maine Corporation and Town of Ayer – Joint Petition for Declaratory Order, STB Financial Docket 33971 at 7 (April 30, 2001) (determining that operation of ICCTA can be reconciled with the Clean Air and Water Acts).  (Pl. Ex. E.)  See also Hi Tech, 382 F.3d at 302-03 (quoting Ford Motor Co. v. Insurance Commissioner of the Commonwealth of Pennsylvania, 874 F.2d 926, 936 (3d Cir. 1989) (a "preemption analysis should be 'tempered by the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted.'")).  Additionally, it is well-established that ICCTA does not preempt a state's ability to exercise

C.   <u>Irreparable Harm</u>

Next, the Court concludes that Defendant has demonstrated immediate irreparable harm in the absence of injunctive relief. As noted above, development by Plaintiff likely will cause irreparable harm to the "critical and valuable resources of the Pinelands." (Def. Br. at 14.)  Specifically, because the Facility will not meet the substantive requirements of the CMP, "valuable surface and groundwater resources that are associated with the Site" will be threatened.  (Def. Supp. Br. at 26.) Moreover, the record suggests the proposed facility does not adhere to New Jersey's air quality standards.  (<u>Id.</u>; Byrne Decl. ¶ 4.)

D.   <u>Balance of Harms</u>

Third, the Court concludes that granting preliminary relief to Defendant will not result in even greater harm to Plaintiff. Despite Plaintiff's suggestion to the contrary, any delay sustained by the Facility in the near future will be caused by the absence of the necessary rail spur and not, as SRNJ argues, regulation of the Facility by the Commission.[31] In any event, as

traditional police powers to protect the public health and safety.  <u>See</u> <u>Village of Ridgefield Park v. NYS&W</u>, 163 N.J. 446, 457-58 (2001); <u>Green Mountain R.R. Corp. v. Vermont</u>, 404 F.3d 638, 643 (2d Cir. 2005).

[31] For this same reason, the Court holds that Plaintiff can not demonstrate immediate irreparable harm.  It is worth noting that there is no inherent inconsistency between, on the one hand, the Court's finding that J.P. Rail will not suffer immediate

Defendant points out, "the need to obtain regulatory approvals does <u>not</u> translate into a de facto refusal to allow the [Facility] to be constructed."[32] (Def. Br. at 22.)

E.   <u>Public Policy</u>

Finally, the Court holds that granting a preliminary injunction in Defendant's favor is consistent with Congressional mandate establishing the Pinelands National Reserve.  (Def. Br. at 14.)  Specifically, as noted in more detail above, the Pinelands National Reserve was established by Congress in 1978 out of recognition that the "approximately 1,000,000 acres of pine-oak forest, extensive surface and ground water resources of high quality, and a wide diversity of rare plant and animal species, provide[] significant ecological, natural, cultural, recreational, educational, agricultural, and public health benefits." 16 U.S.C. § 471i <u>et</u> <u>seq.</u>; 16 U.S.C. § 471i(a)(1); <u>see</u> <u>Gardner</u>, 125 N.J. 193 (describing unique ecological, economic, and cultural features of the New Jersey Pinelands National Reserve).  Granting a preliminary injunction in the Pineland

---

irreparable harm in the absence of a preliminary injunction, and the Court's determination, <u>supra</u>, that deferring adjudication would cause J.P. Rail immediate hardship.  <u>A.O. Smith Corp.</u>, 530 F.2d at 522 (holding the concepts of "hardship to the parties" and "irreparable injury" are "jurisprudential cousins, not identical twins).

[32] In fact, at oral argument counsel for the Pinelands Commission stated that it "would not be a fool's errand" for J.P. Rail to apply to be excepted from the Pinelands Commission's regulatory scheme.

Commission's favor would promote the same policy considertions articulated by Congress when it established the Pinelands National Reserve almost 30 years ago.

Additionally, the policies underlying ICCTA do not favor granting Plaintiff's application for a preliminary injunction. As outlined in 49 U.S.C. § 10101(1)-(15), Congress's concern in passing ICCTA was the regulation of rail transportation. Here, however, as already noted several times, the Facility can not conduct "transportation" activities until SRNJ obtains New Jersey Transit's approval to build the rail spur _and_ the spur is actually built. Moreover, the proposed activities, including tipping, sorting and reloading onto rail cars, will not be performed by the railroad but, rather by the Elwood Entities on land owned by Waszen, Jr. Accordingly, the policy considerations outlined by Congress are not yet fully implicated here.

For the foregoing reasons, the Court holds that Defendant has satisfied the elements warranting a preliminary injunction while Plaintiff has failed to make such a showing. Accordingly, the Court will grant a preliminary injunction in favor of the Pinelands Commission and deny the request by J.P. Rail.

## III. MOTION TO DISMISS THIRD-PARTY COMPLAINT

Defendant filed a Third-Party Complaint against Magic Disposal, Inc., Steve Waszen Sr., Steve Waszen Jr., Elwood Brokerage, Inc., and Elwood Transload, Inc. seeking a judgment pursuant to the National Parks and Recreation Act of 1978, 16

U.S.C. § 471i, the Pinelands Protection Act, N.J.S.A. 13:18A-1 et seq., and the Pineland Commission's CMP, N.J.A.C. 7:50-1 et seq., preliminarily enjoining construction and operation of the Facility.  Third-Party Defendants have moved to dismiss the Third-Party Complaint or, in the alternative, for summary judgment.  Largely for reasons already explained, the motion will be denied.

First, Third-Party Defendants have moved to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., arguing primarily that Defendant/Third-Party Plaintiff's claims are not ripe.  The Court has already determined, supra, that the matter is ripe for review, and will not further discuss that conclusion here. Additionally, because Defendant has stated a claim upon which relief can be granted, the motion to dismiss will be denied.

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must be denied "unless it appears beyond doubt that the [third-party] plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).[33] Here, Defendant/Third-Party Plaintiff claims in the Third-Party

---

[33] A district court must accept any and all reasonable inferences derived from the facts pleaded.  Unger v. Nat'l Residents Corp. v. Exxon Co., U.S.A., 761 F. Supp. 1100, 1107 (D.N.J. 1991); Gutman v. Howard Sav. Bank, 748 F. Supp. 254, 260 (D.N.J. 1990).  Further, the court must view all allegations in the Complaint in the light most favorable to the plaintiff.  See Scheuer, 416 U.S. at 236; Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Complaint that the Facility will be "owned, constructed, controlled and operated by and/or on behalf of the Third-Party Defendants, not Plaintiff." (Def. Opp. Br. at 10.) Indeed, for the reasons already explained at length, the Court has concluded that Defendant will likely prevail on the merits of this claim. At the very least, on a motion for dismissal under Rule 12(b)(6) the allegations contained in the pleadings must be taken as true. Accordingly, the Court holds that Third-Party Complaint does state a claim upon which relief can be granted. The motion to dismiss by Third-Party Defendants will be denied.

Likewise, the motion for summary judgment is without merit. Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S.

at 250; <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Here, as with the dispute between SRNJ and the Pinelands Commission, the third-party claims center, in the first instance, on whether the Facility involves "transportation by rail carrier."  As explained at length above, the Court has concluded that the proposed activities at the Facility do not likely include transportation by Plaintiff but, rather, by Third-Party Defendants.  The property on which the Facility will operate is ostensibly owned by Third-Party Defendant Waszen, Jr.; a substantial part of the Facility's construction and operational costs will be financed by Third-Party Defendants the Elwood Entities; and Third-Party Defendant Magic Disposal intends to use the Facility as an outlet for transporting waste.[34] In any event, at the very least there is a dispute of fact regarding which parties will maintain ultimate responsibility and control over all aspects of the transloading operation.[35]

_____

[34] The Court also notes that the copy of the Ground Lease between Waszen, Jr. and J.P. Rail provided to Atlantic County on April 5, 2005 was sent via facsimile from Magic Disposal's fax machine.  (Dillon Decl. Ex. A.)  Additionally, an e-mail exchange between Messrs. DeClement and Fiorilla is entitled "Magic Ground Lease," (Martin Decl. Ex. 28,) even though the lease was entered into between J.P. Rail and Waszen, Jr.  These facts serve to further highlight the connectedness of all Third-Party Defendants, including Magic Disposal, Inc., in the development and operation of the Facility.

[35] Moreover, as discovery has not been completed, the motion for summary judgment is premature.

## IV.   CONCLUSION

For the foregoing reasons, the Court holds that Defendant has satisfied the elements warranting a preliminary injunction. Accordingly, the Court will grant a preliminary injunction in favor of Defendant and deny the request by Plaintiff. Additionally, the motion to dismiss by Third-Party Defendants will be denied.  The Court is confident that this outcome best serves the fundamental goal of any preliminary injunction analysis – "to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990).

This means that the Pinelands Commission's approval for this development must be sought and obtained before such development can go forward, or until further Order of the Court.  The accompanying Order is entered.


**December 22, 2005**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         U.S. District Court